**SCHLEIER LAW OFFICES, P.C.**
3101 N. Central Avenue
Suite1090
Phoenix, Arizona 85012
Telephone:  (602) 277-0157
Facsimile:  (602) 230-9250

TOD F. SCHLEIER, ESQ. #004612
Tod@SchleierLaw.com
BRADLEY H. SCHLEIER, ESQ. #011696
Brad@SchleierLaw.com

*Attorneys for Plaintiff Danna Whiting*

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Danna Whiting, a single woman, )<br><br>Plaintiff, )<br><br>v. )<br><br>Pima County, a municipal corporation )<br>and Government entity; Pima County )<br>Board of Supervisors; Mark Person, a )<br>married individual; and Cheri Clinton, a )<br>single individual; )<br><br>Defendants. )<br> ) | No. _____<br><br>**COMPLAINT**<br><br>**(JURY TRIAL DEMANDED)** |

Plaintiff Danna Whiting by and through counsel, for her Complaint against all Defendants alleges;

**JURISDICTION AND VENUE**

1.      This is an action against Defendant Pima County to remedy discrimination and retaliation on the basis of disability/impairment in violation of Section 504 of the Rehabilitation Act of 1973. 29 U.S.C. § 701 *et seq*. ("Rehabilitation Act"), and to correct unlawful employment practices on the basis of disability to vindicate Plaintiff's rights, and

1  to make her whole.  Additionally, Plaintiff has state law claims arising out of the same
2  case and controversy against Defendants Mark Person and Cheri Clinton.

3       2.     Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 as this
4  matter involves a federal question under the Rehabilitation Act.

5       3.     This Court has supplemental jurisdiction over Plaintiff's state law claims
6  because said claims are so related to Plaintiff's federal claim that they form part of the
7  same case or controversy pursuant to 28 U.S.C. §1367.

8       4.     The unlawful employment practices described herein were committed within
9  Pima County, State of Arizona.  Accordingly, venue in this Court is proper pursuant to 28
10 U.S.C. § 1391(b).

**PARTIES**

11
12      5.     Plaintiff Danna Whiting (hereinafter "Plaintiff" or "Plaintiff Whiting") is a
13 single woman and at all times relevant herein resided in Tucson, Pima County, State of
14 Arizona.

15      6.     Defendant Pima County is a municipal corporation and government entity
16 governed by an elected Pima County Board of Supervisors and at all times relevant herein
17 was and is doing business in the State of Arizona, including doing business under Health
18 and Community Services dba Pima County Behavioral Health Department.

19      7.     Defendant Pima County Board of Supervisors is comprised of an elected
20 five-member board and among other duties, governs Pima County.

21      8.     Defendant Pima County is an employer subject to the Rehabilitation Act, as
22 amended.

23      9.     Defendant Mark Person is a married individual and all actions alleged herein
24 were performed on behalf of himself individually, his marital community, and done while
25 employed, and during the course of his employment with Pima County.  Defendant Person
26 resides in Tucson, Arizona.

- 2 -

10.     Defendant Cheri Clinton is a single individual and all actions alleged herein were performed on behalf of herself individually.    Some of the actions alleged herein were done while Defendant Clinton was employed with Defendant Pima County, and during the course of her employment with Pima County.  Defendant Clinton resides in Tucson, Arizona.

## BACKGROUND

11.     Defendant Pima County hired Plaintiff Whiting in October 2011 as a Special Staff Assistant.

12.     Plaintiff Whiting was promoted to the position of Behavioral Health Administrator in 2012, and in 2013 she was promoted to Director of the newly created Pima County Behavioral Health Department (PCBHD), one of Defendant's four Pima County Health Departments.

13.     From 2011 through spring of 2017, Plaintiff Whiting reported to Ms. Jan Lesher, Deputy County Administrator for Defendant's Behavioral Health Department.

14.     Throughout Plaintiff's tenure with Defendant Pima County Plaintiff excelled at her job, had good performance that included national recognition for her work and at no time had been made aware of any performance issues or received any formal employee complaints against her.

15.     Plaintiff Whiting was diagnosed with a pituitary tumor in her brain 2010 and has been living with the disability ever since.

16.     Starting in November 2016 Plaintiff Whiting's disability required additional medical care.  On about December 29, 2016, Mr. Chuck Huckleberry, Pima County Administrator, approved Plaintiff's disability accommodation, which allowed Plaintiff to work from home two days per week (Tuesdays and Fridays), which coincided with the days to take medication for her disability and deal with the increased side effects.

1    17.    With Plaintiff's approved disability accommodations, she continued
2    performing her job duties and she was able to care for her disability.

3    18.    During this time there were no complaints about Plaintiff's disability
4    accommodation, nor any complaints that Plaintiff was unable to perform the essential job
5    duties/functions of her position.  The accommodation was never revisited by Pima County
6    HR or her supervisors.

7    19.    On about May 1, 2017, Ms. Lesher was promoted from Deputy County
8    Administrator to Chief Deputy County Administrator, and Dr. Francisco Garcia was
9    promoted into Ms. Lesher's former role as the new Deputy County Administrator, and also
10   became Plaintiff's new Supervisor.  Dr. Garcia now reported to Ms. Lesher.

11   20.    Plaintiff Whiting hired Mark Person in the summer of 2017; she had a prior
12   working relationship him.

13   21.    Defendant Person became angry when Plaintiff Whiting did not acquiesce to
14   his demands to use her position to intimidate and act punitively towards the Sheriff's
15   Department and the medical vendor at the Pima County Jail, Correct Care Solutions.

16   22.    On about February 14, 2018, Plaintiff's Deputy Director Mark Person,
17   expressed his dissatisfaction his Deputy Director position, said he wanted to "be in
18   charge" of behavioral health and that he disagreed with Plaintiff's vision and philosophy
19   for Pima County Behavioral Health, and made it very clear to Plaintiff Whiting that he
20   wanted her job.

21   23.    On or about February 26, 2018, Plaintiff Whiting raised concerns to
22   Defendant Person about his inappropriate relationship with Ms. Cheri Clinton, directed
23   Defendant Person to have no interactions with Defendant Clinton regarding her work or
24   his, and told Defendant Person that he was not Defendant Clinton's supervisor and that he
25   was not to direct her work in any way.

26

24.     In April and May 2018, Plaintiff and her assistant, Tiffany Truax, reported to Defendant's Human Resources ("HR") Plaintiff's concerns about employee Defendant Clinton's continuing performance issues, and sought advice on how to best deal with those issues.

25.     Under HR's direction, Plaintiff Whiting met with Defendant Clinton on about May 3, 2018 about Defendant Clinton's performance issues.  Defendant Clinton became angry and upset, left Plaintiff's office and returned with Plaintiff Whiting's Deputy Director, Mr. Mark Person.

26.     Plaintiff informed Defendant Person she had talked with HR and that this employee situation did not concern him.  Defendant Person openly undermined Plaintiff's authority, interfered with Plaintiff's disciplinary directive from HR, and told Defendant Clinton to stop talking to Plaintiff and to go to HR.

27.     On this day, May 3, 2018, Plaintiff gave Defendant Clinton a letter of instruction outlining the performance issues and a referral for mandatory Employee Assistance Program (EAP) for counseling due to her ongoing performance issues and emotional outbursts.  Defendant Clinton yelled out "you can't make me go to EAP!", refused to sign the referral and began arguing out loud about the performance issues in the letter. Defendant Clinton gathered her things and walked out.  Plaintiff Whiting later learned Defendant Clinton went downtown to Defendant's HR.

28.     Following the May 3, 2018 meeting with Defendant Clinton and Defendant Person, Plaintiff Whiting spoke with her Supervisor, Dr. Garcia, about Defendant Clinton's disciplinary action, Defendant Person's interference, and that Plaintiff was waiting to connect with HR before taking further action.  Plaintiff told Dr. Garcia she did not want to fire Defendant Clinton, even though HR had been advising Plaintiff for over a week to terminate Defendant Clinton.  She also discussed the option of Administrative leave for Defendant Clinton.

29.     After speaking with Dr. Garcia, May 3, 2018, Plaintiff spoke with two Human Resources members, Tiffany Ward, and JJ Johnson and reported the events relating to Defendant Clinton's disciplinary action and sought guidance.  Plaintiff stated she did not want to fire Defendant Clinton. Ms. Ward told Plaintiff there are two choices: Plaintiff could "allow her to continue to behave this way or you can fire her, and I suggest you fire her because she is setting such a bad precedent by being insubordinate to you. If you let her get away with that it sends a message to the entire team."   Plaintiff was repeatedly told by HR staff to fire Defendant Clinton.

30.     Also, during this May 3, 2018 call, Ms. Johnson said she spoke with Defendant Clinton when she showed up at Defendant's downtown to HR and also said she spoke with Mark Person by phone and that Defendant Person complained about the disciplinary actions taken against Defendant Clinton.  Ms. Johnson said she told Defendant Clinton that any complaints about Plaintiff's management should be taken up the chain to Plaintiff's Supervisor, Dr. Francisco Garcia.

31.     On May 3, 2018, Plaintiff Whiting returned to Defendant Clinton's office again asked to meet with Defendant Clinton in the hope of not having to take the course of action directed by HR. Defendant Clinton again went to Defendant Person's office and loudly began saying that Plaintiff Whiting was making her meet with Plaintiff Whiting and that Defendant Clinton did not want to meet with Plaintiff. The staff in the suite watched Defendant Clinton's outburst.  Defendant Clinton repeatedly refused to meet with Plaintiff Whiting and choose to instead create a drama-filled workplace. Accordingly, and with the direction from HR, Plaintiff Whiting terminated Defendant Clinton's employment on May 3, 2018.

32.     Later that same day on May 3, 2018, Plaintiff Whiting called Dr. Garcia and explained she was upset over the outcome with Defendant Clinton and about Defendant Person's intentional interference. Dr. Garcia told Plaintiff he believed HR had given

1    Plaintiff "bad advice" about terminating Defendant Clinton, and that his advice to Plaintiff

2    would have been to do nothing with regard to Defendant Person and to "let things calm

3    down."

4         33.    Defendant Person emailed Plaintiff Whiting on May 7, 2018 telling her that

5    he was meeting with HR.

6         34.    By about noon on May 7, 2018, Dr. Garcia told Plaintiff that Defendant

7    Person was alleging Plaintiff bullied Defendant Person and he wanted to file a formal

8    complaint against Plaintiff. Dr. Garcia also said Defendant Person would be allowed to

9    work from home until he submitted a formal complaint.

10        35.    Near the end of the day on May 7, 2018, Dr. Garcia questioned Plaintiff

11   about her disability accommodation working from home two days a week (Tuesdays and

12   Fridays), and commented that he didn't think Plaintiff was out two days a week and had

13   thought it was only occasionally.  Dr. Garcia told Plaintiff he was going to review

14   Plaintiff's former Supervisor, Ms. Jan Lesher's file on Plaintiff and that he would meet

15   with Plaintiff on Thursday morning about the accommodation.

16        36.    Dr. Garcia's comment seemed odd in light of the fact that Plaintiff Whiting

17   was a direct report of Dr. Garcia and had worked for Dr. Garcia for over a year with the

18   disability accommodations where Plaintiff had been out of the office working from home,

19   two days a week throughout the entire time.

20        37.    Following Defendant Clinton's termination, Defendant Person filed an

21   internal complaint against Plaintiff Whiting alleging claims of bullying and making

22   knowingly false statements supplied by Defendant Clinton and others, of which Defendant

23   Person had no personal knowledge.

24        38.    Defendant Clinton made misleading statements to Pima County HR and

25   participated in an effort to exact some type of revenge against Ms. Whiting and also

26   supplied a copy of a cell phone recording Defendant Clinton made of the November 1,

2017 meeting with Plaintiff Whiting, staff member Ms. Trenace Taulton and Defendant Clinton about Defendant Clinton's concerns about Ms. Taulton's bullying behavior toward Clinton, and instead mischaracterized its contents to support Defendant  Person's bullying complaint.

39.     Defendant Person had repeatedly called and met with HR to formulate a complaint against Plaintiff stating he was afraid of Plaintiff, which is disputed by both Defendant Person's behavior and the numerous text messages he sent to Plaintiff which showed the opposite. Also, numerous staff members felt intimidated and targeted by Defendant Person.  In fact, one employee had previously sent a complaint about Defendant Person's bullying to Plaintiff which she turned over to HR.

40.     Defendant Person's created a situation to further his own personal interests to accomplish his stated goal of getting rid of Plaintiff Whiting in the hope of assuming Plaintiff's role and to continue his personal relationship with Defendant Clinton.

41.     On Friday, May 11, 2018, Plaintiff's disability accommodation day, Dr. Garcia contacted Plaintiff at home, informed her that Defendant Person filed a formal Complaint against Plaintiff Whiting alleging claims of bullying.  Dr. Garcia informed Plaintiff she had to meet with HR on this day at 3:00 p.m. and noted that Plaintiff's job depended on Plaintiff going to HR. Plaintiff's disability accommodation day was ignored, and Plaintiff was forced to come in to work on May 11, 2018, even after Plaintiff explained this was one of her accommodation days and that she had already taken medication for her disability and that she should not drive.

42.      On May 11, 2018, Plaintiff Whiting met with Cory Dent, HR and Dr. Garcia was also present and met about Defendant Person's complaint and Plaintiff was formally placed on administrative leave on May 11, 2018.

43. On about May 14, 2018, Mr. Garcia told Plaintiff he had to disclose to Plaintiff that because of Defendant Person's complaint, Ms. Whiting's ADA accommodation would be "revisited" as one of the outcomes of the investigations.

44. Prior to May 11, 2018, Plaintiff had worked for a year and a half without any questions or concerns relating to Plaintiff's disability accommodations. Pima County HR and Pima County leadership never revisited her accommodation with her. In the midst of a complaint, suddenly it became clear that the major issue was Plaintiff's disability and her accommodations.

45. On Monday, June 18, 2018, Plaintiff's disability accommodations were again disregarded by Defendant Pima County and retaliated against by telling Plaintiff she needed to report to work the next day, Tuesday June 19th, 2018, to be interviewed about Defendant Person's complaint. Only after Plaintiff asked Ms. Marchell Papas from HR if her disability accommodation was taken away was the interview day changed. She was told in that case, she needed to report that same day (Monday) for her interview at 12:45.

46. In addition to disregarding Plaintiff Whiting's disability accommodation day, scheduling her interview for this day and time also contradicted Pima County's policy and letter about administrative leave given to Ms. Whiting which stated that from 12:00 - 1:00 p.m. was not a time Ms. Whiting needed to be available to the County as this was considered her lunch break. Plaintiff Whiting continued to be subjected to discriminatory treatment.

47. Plaintiff was interviewed by Ms. Cathy Bohland, HR, about Defendant Person's complaint and alleged claims of bullying on June 18, 2018 and June 20, 2018, totaling about 13 hours.

48. At the end of Plaintiff's interviews, Plaintiff asked Ms. Bohland if she would interview Plaintiff's witnesses, who could provide exculpatory information on Plaintiff's behalf relating to Defendant Person's complaint, and Ms. Bohland would not commit to

talking to any of Plaintiff's witnesses, only saying she would consult her notes. Ms. Bohland never interviewed any of Plaintiff Whiting's exculpatory witnesses.

49.    On June 21, 2018 Defendant extended Plaintiff's administrative leave for another 30 days.

50.    On June 21, 2018, Dr. Garcia called Plaintiff to inform her that her administrative leave was extended for another 30 days. During this call Plaintiff stated she believed she was treated unfairly by Ms. Bohland. Dr. Garcia responded, "oh geeze" but did not offer to intervene or even inquire as to why Plaintiff believes this to be the case.

51.    Dr. Garcia texted Plaintiff on Monday, July 23, 2018 stating he wanted to meet that afternoon to discuss "options".  Dr. Garcia and Jan Lesher met with Plaintiff that afternoon and Dr. Garcia stated he believed Plaintiff was treated fairly, despite never asking Plaintiff why she believed the process had been unfair. He told her she had 24 hours to decide to submit a letter of resignation or choose to be fired.

52.    Plaintiff refused to resign and was terminated effective July 24, 2018.

53.    When the staff were informed that Plaintiff Whiting no longer worked for the County, Ms. Linda Everett, a staff person who reported to Mark Person  was noted by multiple people to have a smile on her face with this news, asked Dr. Francisco Garcia if Mark Person was going to be put in Plaintiff's position.

54.    Defendant Person made various defamatory statements about Plaintiff Whiting with regard to bullying and Plaintiff's actions as a supervisor in an effort to get her fired so he could have her job. Defendant Person's defamatory statements placed Plaintiff Whiting in a false light.

55.    Defendant Clinton also made defamatory statements about Plaintiff Whiting with regard to Plaintiff Whiting engaging in bullying behavior and relating to her abilities as a supervisor, to both people inside and outside of the County.  Defendant Clinton's defamatory statements placed Plaintiff Whiting in a false light.

56.     On two separate occasions, staff in Plaintiff's department reported to Plaintiff complaints of bullying in the workplace including one complaint against Mark Person that was reported to Corry Dent in Human Resources.

57.     However, those complaints were ignored by Human Resources, the staff members making the complaints were not asked to meet with HR, nor was Defendant Person placed on administrative leave, disciplined or terminated.

58.     Additionally, Plaintiff was aware of a number of other non-disabled, similarly situated, management level employees who were accused of bullying behavior but were not terminated by Defendant Pima County.

59.     Plaintiff was made aware that Dr. Garcia intervened in at least one of these complaints to halt the investigation against one of his non-disabled, staff who was accused of multiple issues.

## COUNT ONE

## VIOLATION OF THE REHABILITATION ACT

## (Against Pima County Only)

60.     By reference hereto, Plaintiff hereby incorporates all prior paragraphs as if fully alleged herein.

61.     At all times relevant hereto, Defendant Pima County has been subject to the requirements of the Rehabilitation Act, as the County receives and utilizes federal funding.

62.     At all times relevant hereto, Plaintiff was an employee with a disability/impairment as defined under the Rehabilitation Act or she was regarded as a person with an impairment as defined by the statute and performed all her responsibilities with an approved accommodation.

63.     Prior to May 2018, Plaintiff had been supervised for the prior year by Dr. Garcia and utilized an accommodation where she worked from home two days a week. Following Dr. Garcia finding out about the accommodation, he immediately questioned

the accommodation and stated that it would be "revisited" and, in less than 90 days, Plaintiff's employment with Defendant Pima County was terminated.

64.     Plaintiff's was discriminated against, retaliated against and terminated due to her disability/impairment accommodation by Defendant Pima County in violation of Section 504 of the Rehabilitation Act.

65.     As a direct and proximate result of Defendant Pima County's intentional discrimination, Plaintiff has sustained economic damages in the form of loss of wages and the value of job benefits in an amount to be proven at trial.

66.     In addition, Defendant Pima County's actions have caused, continue to cause, and will cause Plaintiff to suffer damages for emotional distress, mental anguish, loss of enjoyment of life, damage to her reputation due to her termination, and other non-pecuniary losses all in an amount to be proven at trial.

**COUNT TWO**

**INTERFERENCE WITH CONTRACTUAL RELATIONSHIP**

**(AGAINST DEFENDANTS MARK PERSON AND CHERI CLINTON ONLY)**

67.     By reference hereto, Plaintiff hereby incorporates all prior paragraphs as if fully alleged herein.

68.     A valid employment contractual relationship or business expectancy existed between Plaintiff and Pima County.

69.     Defendants Mark Person and Cheri Clinton had knowledge of the employment relationship or business expectancy between Plaintiff and Pima County.

70.     Defendants Person and Clinton intentionally interfered inducing or causing a breach or termination of the employment contractual relationship or expectancy between Plaintiff and Pima County with regard to their actions regarding Person's and Clinton's false allegations of bullying against Plaintiff that led to the termination of Plaintiff Whiting's employment relationship with Pima County.

71.     As a direct and proximate result of Defendants Person's and Clinton's intentional interference, Plaintiff has sustained economic damages in the form of loss of wages and the value of job benefits in an amount to be proven at trial.

72.     As a direct and proximate result of Defendants Person's and Clinton's intentional interference, Plaintiff has also suffered damages in the form of emotional distress, anxiety, depression, sleeplessness, loss of self-worth, loss of reputation in the community, her career, and employment with the County, and extreme stress which has exacerbated the physical symptoms and the side effects of Plaintiff's serious medical condition.

73.     Defendants Person's and Clinton's conduct was willful, malicious and evidence an evil mind and Plaintiff is, therefore, entitled to recover punitive and exemplary damages arising from Defendant Person's and Clinton's tortious conduct.

**COUNT THREE**

**DEFAMATION**

**(AGAINST DEFENDANTS MARK PERSON AND CHERI CLINTON ONLY)**

74.     By reference hereto, Plaintiff hereby incorporates all prior paragraphs as if fully alleged herein.

75.     Defendants Mark Person and Cheri Clinton made various false statements in support of Defendant Person's internal complaint against Plaintiff relating to Plaintiff being a bully and about her performance as a supervisor including but not limited to Plaintiff's actions relating to the termination of Defendant Cheri Clinton.  Said false statements were published to individuals inside and outside the County.

76.     Defendants Person and Clinton made various false statements against Plaintiff knowing the statements were false and defamatory.

77.     These published defamatory statements are false and bring Plaintiff into disrepute, contempt and ridicule and impeach her honesty, integrity, virtue and reputation

- 13 -

by stating that she engaged in such misconduct in her trade, profession, office or occupation.  Defendants Person's and Clinton's statements are also defamatory because they would deter third persons from dealing or associating with Plaintiff.

78.    As a direct and proximate result of Defendants Person's and Clinton's false and defamatory statements Plaintiff has sustained economic damages in the form of loss of wages and the value of job benefits in an amount to be proven at trial.

79.    As a direct and proximate result of Defendants Person's and Clinton's defamatory, Plaintiff has also suffered damages in the form of emotional distress, anxiety, depression, sleeplessness, loss of self-worth, loss of reputation in the community, her career, and employment with the County, and extreme stress which has exacerbated the physical symptoms and the side effects of Plaintiff's serious medical condition.

80.    Defendants Person's and Clinton's conduct was willful, malicious and in reckless disregard to the rights of Plaintiff that evidence an evil mind and Plaintiff is therefore entitled to recover punitive and exemplary damages arising from Defendant Person's conduct.

## COUNT FOUR

### FALSE LIGHT INVASION OF PRIVACY

### (AGAINST DEFENDANTS MARK PERSON AND CHERI CLINTON ONLY)

81.    By reference hereto, Plaintiff hereby incorporates all prior paragraphs as if fully alleged herein.

82.    Defendants Mark Person and Cheri Clinton made various false statements in support of Defendant Person's internal complaint against Plaintiff relating to Plaintiff being a bully and about her performance as a supervisor including but not limited to Plaintiff's actions relating to the termination of Defendant Cheri Clinton.  Said false statements were published to individuals inside and outside the County.

83.     Defendants Person and Clinton made various false statements with knowledge that said statement were false or made with a reckless disregard for the truth.

84.     That said statements created a false implication and innuendo about Plaintiff designed to bring Plaintiff into disrepute, contempt and ridicule and impeach her honesty, integrity, virtue and reputation by stating that she engaged in such misconduct in her trade, profession, office or occupation.

85.     Defendants Person's and Clinton's statements placed Plaintiff in a false light highly offensive to a reasonable person.

86.     As a direct and proximate result of Defendants Person's and Clinton's statements placing Plaintiff in a false light, Plaintiff has sustained economic damages in the form of loss of wages and the value of job benefits in an amount to be proven at trial.

87.     As a direct and proximate result of Defendants Person's and Clinton's statements placing Plaintiff in a false light, Plaintiff has also suffered damages in the form of emotional distress, anxiety, depression, sleeplessness, loss of self-worth, loss of reputation in the community, her career, and employment with the County, and extreme stress.

88.     Defendants Person's and Clinton's conduct was willful, malicious and in reckless disregard to the rights of Plaintiff so as to evidence an evil mind and Plaintiff is therefore entitled to recover punitive and exemplary damages arising from Defendants Person's and Clinton's conduct.

**WHEREFORE**, Plaintiff demands judgment against Defendants, jointly and severally, as follows:

1.     For General and Special damages to be proven at trial;

2.     For compensatory damages relating to emotional distress as proven at trial;

- 15 -

3.      For punitive and exemplary damages to be proven at trial (against Person and Clinton only);

4.      For reasonable attorneys' fees and costs; and

5.      For such other relief, the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a jury trial.

DATED this  2nd  day of  May, 2019.

**SCHLEIER LAW OFFICES, P.C.**

/s/ Bradley H. Schleier
Bradley H. Schleier
3101 North Central Ave., Suite 1090
Phoenix, Arizona 85012
Brad@SchleierLaw.com
*Attorneys for Plaintiff Danna Whiting*

- 16 -