**SCHLEIER LAW OFFICES, P.C.**
3101 N. Central Avenue
Suite1090
Phoenix, Arizona 85012
Telephone: (602) 277-0157
Facsimile: (602) 230-9250

TOD F. SCHLEIER, ESQ. #004612
Tod@SchleierLaw.com
BRADLEY H. SCHLEIER, ESQ. #011696
Brad@SchleierLaw.com

*Attorneys for Plaintiff Danna Whiting*

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Danna Whiting, a married woman, | )<br>) No. CV-19-00249-TUC-JGZ<br>) |
| Plaintiff | )<br>) |
| v. | )<br>) **SECOND AMENDED**<br>) **COMPLAINT**<br>) |
| Pima County, a governmental entity;<br>Pima County Board of Supervisors;<br>Mark Person, a married individual; and<br>Cheri Clinton, a single individual; | )<br>) **(JURY TRIAL DEMANDED)**<br>)<br>) |
| Defendants. | )<br>) |
| | ) |

Plaintiff Danna Whiting by and through counsel, for her Complaint against all Defendants alleges;

**JURISDICTION AND VENUE**

1. This is an action against Defendant Pima County to remedy discrimination and retaliation on the basis of disability/impairment in violation of the Americans With Disabilities Act of 1990, 42 U.S.C. §§ 12101, *et seq.,* including the Amendments contained in the ADA Amendments Act of 2008 ( hereinafter collectively "ADAA") and Section 504 of the Rehabilitation Act of 1973. 29 U.S.C. § 701 *et seq*. ("Rehabilitation Act"), and to

correct unlawful employment practices on the basis of disability to vindicate Plaintiff's rights, and to make her whole. Additionally, Plaintiff has state law claims arising out of the same case and controversy against Defendants Mark Person and Cheri Clinton.

2. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 as this matter involves a federal question under the Rehabilitation Act and the ADAA.

3. This Court has supplemental jurisdiction over Plaintiff's state law claims because said claims are so related to Plaintiff's federal claim that they form part of the same case or controversy pursuant to 28 U.S.C. §1367.

4. Plaintiff filed a Charge of Discrimination and retaliation based on her disability with the EEOC on August 23, 2018. The EEOC and Arizona Civil Rights Division ("ACRD") have a work sharing agreement between the two entities. The Department of Justice/EEOC issued its Notice of Right to Sue dated June 5, 2019.

5. Plaintiff has complied fully with all prerequisites for jurisdiction in this Court under the ADAA.

6. The unlawful employment practices described herein were committed within Pima County, State of Arizona. Accordingly, venue in this Court is proper pursuant to 28 U.S.C. § 1391(b).

**PARTIES**

7. Plaintiff Danna Whiting (hereinafter "Plaintiff" or "Plaintiff Whiting") is a married woman and at all times relevant herein resided in Tucson, Pima County, State of Arizona.

8. Defendant Pima County is a governmental entity governed by an elected Pima County Board of Supervisors and at all times relevant herein was and is doing business in the State of Arizona, including doing business under Health and Community Services dba Pima County Behavioral Health Department.

9. Defendant Pima County Board of Supervisors is comprised of an elected five-member board and among other duties, governs Pima County.

10. Defendant Pima County is an employer subject to the ADAA and Rehabilitation Act, as amended. Defendants Pima County and Pima County Board of Supervisors shall collectively be referred to as "Pima County."

11. Defendant Mark Person is a married individual and all actions alleged herein were performed on behalf of himself individually for his own personal benefit, the benefit of his marital community, and done while employed with Pima County. Defendant Person resides in Tucson, Arizona.

12. Defendant Cheri Clinton is a single individual and all actions alleged herein were performed on behalf of herself individually. Some of the actions alleged herein were done while Defendant Clinton was employed with Defendant Pima County. Defendant Clinton resides in Tucson, Arizona.

## BACKGROUND

13. Defendant Pima County hired Plaintiff Whiting in October 2011 as a Special Staff Assistant.

14. Plaintiff Whiting was promoted to the position of Behavioral Health Administrator in 2012, and in 2013 she was promoted to Director of the newly created Pima County Behavioral Health Department (PCBHD), one of Defendant's four Pima County Health Departments.

15. From 2011 through spring of 2017, Plaintiff Whiting reported to Ms. Jan Lesher, Deputy County Administrator for Defendant's Behavioral Health Department.

16. Throughout Plaintiff's tenure with Defendant Pima County Plaintiff excelled at her job, had good performance that included national recognition for her work and at no time had been made aware of any performance issues or received any formal employee complaints against her.

1    17.    Plaintiff Whiting was diagnosed with a pituitary tumor in her brain 2010 and

2    has been living with the disability ever since.

3    18.    Starting in November 2016 Plaintiff Whiting's disability required additional

4    medical care.   On about December 29, 2016, Mr. Chuck Huckleberry, Pima County

5    Administrator, approved Plaintiff's disability accommodation, which allowed Plaintiff to

6    work from home two days per week (Tuesdays and Fridays), which coincided with the days

7    to take medication for her disability and deal with the increased side effects.

8    19.    Ms. Jan Lesher was aware of Plaintiff's disability and her approved ADAA

9    accommodations.

10   20.    With Plaintiff's approved disability accommodations, she continued

11   performing her job duties and she was able to care for her disability.

12   21.    During this time there were no complaints about Plaintiff's disability

13   accommodation, nor any complaints that Plaintiff was unable to perform the essential job

14   duties/functions of her position.   The accommodation was never revisited by Pima County

15   HR or her supervisors.

16   22.    On about May 1, 2017, Ms. Lesher was promoted from Deputy County

17   Administrator to Chief Deputy County Administrator, and Dr. Francisco Garcia was

18   promoted into Ms. Lesher's former role as the new Deputy County Administrator, and also

19   became Plaintiff's new Supervisor.  Dr. Garcia now reported to Ms. Lesher.

20   23.    Prior to employment with Pima County, Plaintiff Whiting, Defendant Person,

21   and Defendant Clinton worked together at COPE Community Services from approximately

22   2005 to 2010.

23   24.    Plaintiff Whiting was Defendants Clinton's and Person's supervisor at COPE.

24   25.    During their employment with COPE, Defendant Whiting was made aware

25   that Defendants Person and Clinton were involved in an intimate relationship.

26

- 4 -

26. The relationship was openly discussed by Defendant Clinton with Plaintiff as well as their fellow COPE employees.

27. During their time at COPE, Plaintiff formally reprimanded both Defendants Clinton and Person because their personal relationship was disruptive to the workplace as they had lied to Plaintiff in order to take time off together.

28. In addition to Plaintiff, other COPE employees, some of which will be witnesses in this underlying matter and employees of Defendant Pima County, were well aware of the relationship between Person and Clinton and the disruption it caused in the workplace.

29. Shortly following the reprimand and only months after the relationship began, Plaintiff understood that the relationship had ended.

30. In October 2014 after Plaintiff was employed by Pima County, Defendant Clinton reached out to Plaintiff seeking employment.

31. Plaintiff invited Clinton to formally apply for positions on several occasions but Clinton did not apply.

32. It was not until July of 2015 that Clinton once again approached Plaintiff about a potential position.

33. At the time, Plaintiff was having a personal crisis relating to the birth of her daughter who was seriously ill. Plaintiff decided to present Ms. Clinton as a direct appointment in light of the fact that Plaintiff needed some assistance as she was going on leave to care for her seriously ill daughter.

34. Defendant Clinton started with Pima County on September 8, 2015 and was under the direct supervision of Plaintiff. Defendant Clinton reported directly to Plaintiff throughout the entirety of her employment with Pima County.

35. Throughout her entire tenure with Pima County, Defendant Clinton struggled with interpersonal conflicts with multiple members of staff.

36. Following her employment at COPE, Plaintiff had only occasional contact with Defendant Person.

37. On about March 4, 2015, Plaintiff discussed with Defendant Person an open position of lower level management in her department at the County. Defendant Person expressed interest in leaving his current job and pursuing employment working for Plaintiff Whiting.

38. In the course of their conversations about his skillset, Defendant Person heavily exaggerated his experience and qualifications, which Whiting would later discover in 2017 when he could not perform his job duties satisfactorily.

39. On April 10, 2015, Defendant Person turned down the offer, saying the position was beneath him, did not pay enough, and did not meet or align with his assessment of his skill level.

40. Plaintiff Whiting and Defendant Person did not communicate again for approximately two years when Defendant Person suddenly contacted Plaintiff via text message asking Plaintiff to meet him for lunch. Plaintiff scheduled a lunch meeting by text for May 18, 2017.

41. Plaintiff did not know the reason for Defendant Person's request to meet and did not discuss it with Defendant Clinton.

42. On or about May 16, 2017, Defendant Clinton made it known to Plaintiff Whiting that she was back in communication with Defendant Person and was aware of their upcoming lunch plans on May 18, 2017.

43. Defendant Clinton then began heavily lobbying and advocating for Plaintiff Whiting to hire Defendant Person for the open Deputy Director position, suggesting that "Marky Mark", as Defendant Clinton called Defendant Person, would be a "great fit" for the department.

44. Defendant Person met with Plaintiff on May 18, 2017. He told Plaintiff Whiting that he asked her to lunch to discuss any opportunities she had available, saying he was "tired" of his current job, and was looking for a place to go that had opportunity for advancement.

45. Plaintiff Whiting discussed the open position of Deputy Director but told him that she was unsure of what "advancement" opportunities would exist for him, unless she left her position, which was possible, but not for sure due to ongoing medical issues with her daughter.

46. Defendant Person told Plaintiff Whiting he wanted the job of Deputy Director and was subsequently hired at the County on or about August 14, 2017.

47. Defendant Person was under the direct supervision of Plaintiff Whiting.

48. Defendant Person was not a supervisor of Defendant Clinton at any time, nor in the published chain of command for Defendant Clinton at any level during their employment at Pima County.

49. Around that time, Defendant Person told a witness who congratulated him on being hired at the County that he believed he should be in a position higher than Deputy Director at that point in his career.

50. By October of 2017, Defendant Person was openly undermining Plaintiff Whiting's authority, ignoring her directions to him, and began to engage in condescending verbal attacks against Plaintiff whenever he disagreed with her.

51. In these instances, Plaintiff Whiting tried to redirect him back to his work, train him in the work of the County and counsel him, but over time realized he was uninterested in such guidance.

52. On October 5, 2017, Defendant Person engaged in one of these attacks and chastised Plaintiff Whiting when she had tried to give him counsel, rejecting her direction to him saying that he should be in charge.

53. During this same time, Defendant Person became angry when Plaintiff Whiting did not acquiesce to his demands to use her position to intimidate and act punitively towards the Sheriff's Department and the medical vendor at the Pima County Jail, Correct Care Solutions.

54. On about February 14, 2018, Plaintiff's Deputy Director Mark Person, expressed his dissatisfaction his Deputy Director position, said he wanted to "be in charge" of behavioral health and that he disagreed with Plaintiff's vision and philosophy for Pima County Behavioral Health, and made it very clear to Plaintiff Whiting that he wanted her job.

55. During this exchange, Defendant Person became so enraged and animated in berating Plaintiff Whiting that he sat on his hands to seem less physically threatening to Plaintiff Whiting.

56. Defendant Person made statements about Plaintiff Whiting being "run over by a car" as he spoke of his desire to run the department, which Plaintiff took as a veiled threat.

57. Defendant Person verbalized his intent in changing Plaintiff Whiting's future and well-being.

58. Defendant Person made clear he would not lose someone of great value and significance in his life where it was apparent that he intimating about his relationship with Defendant Clinton. Defendant also admitted in the meeting to "after hours" conversations with Defendant Clinton that he knowingly twisted, changed, maligned, and weaponized information and facts to use against Plaintiff Whiting to cost her future.

59. Plaintiff Whiting pushed back against Defendant Person's unwarranted, malicious attacks and corrected him as to his accusations.

60. After the meeting, it was apparent and Defendant Person made clear his willingness to lie and distort the facts surrounding events in the office, and would follow through on his threats.

61. It was also during this time period that Plaintiff began to be concerned as it appeared that Defendants Clinton and Person had restarted their personal intimate relationship.

62. On or about February 26, 2018, Plaintiff Whiting raised concerns to Defendant Person about his inappropriate relationship with Ms. Cheri Clinton, directed Defendant Person to have no interactions with Defendant Clinton regarding her work or his work, and told Defendant Person that he was not Defendant Clinton's supervisor and that he was not to direct her work in any way.

63. In April and May 2018, Plaintiff and her assistant, Tiffany Truax, reported to Defendant's Human Resources ("HR") Plaintiff's concerns about employee Defendant Clinton's continuing performance issues and sought advice on how to best deal with the situation.

64. Under HR's direction, Plaintiff Whiting met with Defendant Clinton on about May 3, 2018 about Defendant Clinton's performance issues. Defendant Clinton became angry and upset, left Plaintiff's office, and returned with Plaintiff Whiting's Deputy Director, Mr. Mark Person.

65. Plaintiff informed Defendant Person she had talked with HR and that this employee situation did not concern him. Defendant Person physically interfered with Plaintiff Whiting's supervision of Defendant Clinton and repeatedly told Defendant Clinton to be insubordinate to Plaintiff Whiting who attempted to calm Clinton down and have a conversation with her to discuss serious performance issues. Defendant Person's conduct openly undermined Plaintiff's authority, interfered with Plaintiff's disciplinary directive from HR, and told Defendant Clinton to stop talking to Plaintiff and to go to HR.

66. On this day, May 3, 2018, Plaintiff gave Defendant Clinton a letter of instruction outlining the performance issues and a referral for mandatory Employee Assistance Program (EAP) for counseling due to her ongoing performance issues and

emotional outbursts. Defendant Clinton yelled out "you can't make me go to EAP!", refused to sign the referral, and began arguing out loud about the performance issues in the letter. Defendant Clinton gathered her things and walked out. Plaintiff Whiting later learned Defendant Clinton went downtown to Defendant's HR.

67. Following the May 3, 2018 meeting with Defendant Clinton and Defendant Person, Plaintiff Whiting spoke with her Supervisor, Dr. Garcia, about Defendant Clinton's disciplinary action, Defendant Person's interference, and that Plaintiff was waiting to connect with HR before taking further action. Plaintiff told Dr. Garcia she did not want to fire Defendant Clinton, even though HR had been advising Plaintiff for over a week to terminate Defendant Clinton. She also discussed the option of Administrative leave for Defendant Clinton.

68. After speaking with Dr. Garcia, May 3, 2018, Plaintiff spoke with two Human Resources members, Tiffany Ward, and JJ Johnson and reported the events relating to Defendant Clinton's disciplinary action and sought guidance. Plaintiff stated she did not want to fire Defendant Clinton. Ms. Ward told Plaintiff there are two choices: Plaintiff could "allow her to continue to behave this way or you can fire her, and I suggest you fire her because she is setting such a bad precedent by being insubordinate to you. If you let her get away with that it sends a message to the entire team." Plaintiff was repeatedly told by HR staff to fire Defendant Clinton.

69. Also, during this May 3, 2018 call, Ms. Johnson said she spoke with Defendant Clinton when she showed up at Defendant's downtown to HR and also said she spoke with Mark Person by phone and that Defendant Person complained about the disciplinary actions taken against Defendant Clinton even though he was not Ms. Clinton's supervisor or involved in the numerous discussion that Plaintiff had with human resources about Defendant Clinton's work performance. Ms. Johnson said she told Defendant Clinton

that any complaints about Plaintiff's management should be taken up the chain to Plaintiff's Supervisor, Dr. Francisco Garcia.

70.     On May 3, 2018, Plaintiff Whiting returned to Defendant Clinton's office again asked to meet with Defendant Clinton in the hope of not having to take the course of action directed by HR. Defendant Clinton again went to Defendant Person's office and loudly began saying that Plaintiff Whiting was making her meet with Plaintiff Whiting and that Defendant Clinton did not want to meet with Plaintiff. The staff in the suite watched Defendant Clinton's outburst.  Defendant Clinton repeatedly refused to meet with Plaintiff Whiting and choose to instead create a drama-filled workplace. Accordingly, and with the direction from HR, Plaintiff Whiting terminated Defendant Clinton's employment on May 3, 2018.

71.     Plaintiff Whiting went to Defendant Person after Defendant Clinton left the building and accused him of interfering  in the situation with Defendant Clinton due  to his personal relationship with Clinton. He did not dispute this accusation.

72.     Later that same day on May 3, 2018, Plaintiff Whiting called Dr. Garcia and explained she was upset over the outcome with Defendant Clinton and about Defendant Person's intentional interference. Dr. Garcia told Plaintiff he believed HR had given Plaintiff "bad advice" about terminating Defendant Clinton, and that his advice to Plaintiff would have been to do nothing with regard to Defendant Person and to "let things calm down."

73.     The following day, Plaintiff Whiting was not in the office as this was one of  her accommodation days.

74.     Defendant Person took advantage of Plaintiff being out of the office by meeting with multiple staff to generate antipathy towards Whiting, talking to HR, formulating a strategy  which ultimately took the form of a bullying complaint against Plaintiff.

75. Pima County does have a specific policy against "Bullying" that is contained in Policy Number D23.1. The policy specifically defines Bullying as "intentional behavior with the purpose of creating an abusive work environment for and /or by an employee or employees. Bullying is behavior in the workplace that a reasonable person would find hostile, offensive, and not obviously related to an employer's legitimate business interests." The Policy specifically provides examples of workplace bullying in General as well as bullying by a supervisor.

76. Defendant Person emailed Plaintiff Whiting on May 7, 2018 telling her that he was meeting with HR.

77. By about noon on May 7, 2018, Dr. Garcia told Plaintiff that Defendant Person was alleging Plaintiff bullied Defendant Person and he wanted to file a formal complaint against Plaintiff. Dr. Garcia also said Defendant Person would be allowed to work from home until he submitted a formal complaint.

78. Near the end of the day on May 7, 2018, Dr. Garcia questioned Plaintiff about her disability accommodation working from home two days a week (Tuesdays and Fridays), and commented that he didn't think Plaintiff was out two days a week and had thought it was only occasionally. Dr. Garcia told Plaintiff he was going to review Plaintiff's former Supervisor, Ms. Jan Lesher's file on Plaintiff and that he would meet with Plaintiff on Thursday morning about the accommodation.

79. Dr. Garcia's comment seemed odd in light of the fact that Plaintiff Whiting was a direct report of Dr. Garcia and had worked for Dr. Garcia for over a year with the disability accommodations where Plaintiff had been out of the office working from home, two days a week throughout the entire time.

80. Following Defendant Clinton's termination, Defendant Person filed an internal complaint against Plaintiff Whiting alleging claims of bullying and making

knowingly false statements supplied by Defendant Clinton and others, of which Defendant Person had no personal knowledge.

81.     Defendant Clinton made misleading statements to Pima County HR and participated in an effort to get revenge against Ms. Whiting for firing her.

82.     She also supplied a copy of a cell phone recording Defendant Clinton made of the November 1, 2017 meeting with Plaintiff Whiting, staff member Ms. Trenace Taulton and Defendant Clinton which related to Defendant Clinton's concerns about Ms. Taulton's bullying behavior toward Clinton and instead mischaracterized its contents to support Defendant Person's bullying complaint.

83.     Moreover, Defendant Clinton created a false narrative and accused Plaintiff Whiting of being a racist when it came to her dealings with Ms. Taulton's employment and Taulton's termination. In fact, Ms. Clinton told Ms. Whiting that Ms. Whiting was not a racist in discussions relating to Ms. Taulton in light of Defendant Clinton's statement that Ms. Taulton "looks at me like a privileged white girl."

84.     Likewise, Defendant Person also provided a false narrative to Pima County relating to the termination of Ms. Taulton trying to show that Plaintiff was a bully towards Ms. Taulton which led to her termination.

85.     Other staff involved with Ms. Taulton including Defendants Clinton and Person agreed that Ms. Taulton had engaged in unacceptable behavior. Defendant Clinton repeatedly disparaged Ms. Taulton and claimed that Ms. Taulton used race as a crutch any time her performance was challenged.

86.     In fact, Defendant Person worked with Plaintiff in deciding that termination was appropriate for Ms. Taulton and was the person who terminated Ms. Taulton for falsifying mileage logs and timesheets, threatening co-workers, insubordination, and repeated HIPAA violations.

87. Defendant Person later used the Taulton termination as part of his complaint stating it caused him embarrassment and that it was a decision he did not know about, that it was poorly  handled, despite the being the person who fired her and made all subsequent decisions after her termination.

88. After the termination of Ms. Taulton, Defendant Person had texted Plaintiff about the termination and asked Plaintiff to buy him a drink.  He also noted that Plaintiff's personnel "decisions and assessments are all spot on. . . your approach, strategy, and follow-through are all sound."

89. Defendant Person had repeatedly called and met with HR to formulate a complaint against Plaintiff stating he was afraid of Plaintiff, which is disputed by both Defendant Person's behavior and the numerous text messages he sent to Plaintiff which showed that he was not fearful. Also, numerous staff members felt intimidated and targeted by Defendant Person.  In fact, one employee had previously sent a complaint about Defendant Person's bullying to Plaintiff which she turned over to HR.

90. Defendant Person's created a situation to further his own personal interests to accomplish his stated goal of getting rid of Plaintiff Whiting in the hope of assuming Plaintiff's role and to continue his personal relationship with Defendant Clinton.

91. On Friday, May 11, 2018, Plaintiff's disability accommodation day, Dr. Garcia contacted Plaintiff at home, informed her that Defendant Person filed a formal Complaint against Plaintiff Whiting alleging claims of bullying.  Dr. Garcia informed Plaintiff she had to meet with HR on this day at 3:00 p.m. and noted that Plaintiff's job depended on Plaintiff going to HR. Plaintiff's disability accommodation day was ignored, and Plaintiff was forced to come in to work on May 11, 2018, even after Plaintiff explained this was one of her accommodation days and that she had already taken medication for her disability and that she should not drive.

92. On May 11, 2018, Plaintiff Whiting met with Cory Dent, HR and Dr. Garcia was also present and met about Defendant Person's complaint and Plaintiff was formally placed on administrative leave on May 11, 2018.

93. On about May 14, 2018, Mr. Garcia told Plaintiff he had to disclose to Plaintiff that because of Defendant Person's complaint, Ms. Whiting's ADA accommodation would be "revisited" as one of the outcomes of the investigations.

94. Prior to May 11, 2018, Plaintiff had worked for a year and a half without any questions or concerns relating to Plaintiff's disability accommodations. Pima County HR and Pima County leadership never revisited her accommodation with her. In the midst of a complaint, suddenly it became clear that the major issue was Plaintiff's disability and her accommodations.

95. On Monday, June 18, 2018, Plaintiff's disability accommodations were again disregarded by Defendant Pima County and retaliated against by telling Plaintiff she needed to report to work the next day, Tuesday June 19th, 2018, to be interviewed about Defendant Person's complaint. Only after Plaintiff asked Ms. Marchell Papas from HR if her disability accommodation was taken away was the interview day changed. She was told in that case, she needed to report that same day (Monday) for her interview at 12:45.

96. In addition to disregarding Plaintiff Whiting's disability accommodation day, scheduling her interview for this day and time also contradicted Pima County's policy and letter about administrative leave given to Ms. Whiting which stated that from 12:00 - 1:00 p.m. was not a time Ms. Whiting needed to be available to the County as this was considered her lunch break. Plaintiff Whiting continued to be subjected to discriminatory treatment.

97. Plaintiff was interviewed by Ms. Cathy Bohland, HR, about Defendant Person's complaint and alleged claims of bullying on June 18, 2018 and June 20, 2018, totaling about 13 hours.

98.    At the end of Plaintiff's interviews, Plaintiff asked Ms. Bohland if she would interview Plaintiff's witnesses, who could provide exculpatory information on Plaintiff's behalf relating to Defendant Person's complaint, and Ms. Bohland would not commit to talking to any of Plaintiff's witnesses, only saying she would consult her notes. Ms. Bohland never interviewed any of Plaintiff Whiting's exculpatory witnesses.

99.    In addition to the misinformation provided by Defendant Clinton described above, during the course of the investigation, Defendant Clinton provided doctored/edited information where she had taped Plaintiff on May 3, 2018, but only turned over the last couple of minutes of their interaction to the HR department, conveniently not supplying them with the overly emotional and highly dramatic way she had behaved for hours prior to her termination. This information was later used as a basis to discredit the credibility of Plaintiff Whiting with Clinton having lied about what really happened on May 3, 2018.

100.    Similarly, Defendant Person also provided emails in the course of the investigation to support his allegations of bullying that were apparently printed by Defendant Clinton off of the County email system prior to her termination which supported that Defendants Clinton and Person had a planned effort to get Plaintiff Whiting fired which predated the events of May 3, 2018.

101.    Defendants Person and Clinton engaged in a pattern of total disregard of Plaintiff's directions, insubordination, as well as engaging in a course of conduct and making false statements designed to manipulate other staff against Plaintiff's authority which ultimately caused a total breakdown in her unit, influenced what people told HR during the investigation and, ultimately the loss of Plaintiff's job.

102.    Defendants Person and Clinton also intentionally entered into a course of action where they worked to influence co-workers and subordinates after Clinton's termination, and to create a false narrative that would later be repeated to HR during staff interviews. One example is witnesses who had no knowledge of the nature of Clinton's

performance issues of Clinton discussed, in a taped interview that was part of the investigation, a "six page document" that Whiting supposedly stored up to use against Clinton. This information was completely untrue and could only have been relayed to the witnesses by Defendant Clinton on her own or through other staff she continued to talk with after her dismissal. These same employees then said negative things about Whiting based on this lie.

103.    Defendant Person made clear his willingness to lie and distort the facts surrounding events in the office, and would follow through on his threats to paint Plaintiff Whiting in a false light by leveling multiple accusations against her in the HR complaint he filed to both get revenge for firing Clinton, but also to position himself to be promoted into Whiting's job having disposed of the Plaintiff, who was in the way of him having the job he had clearly sought to have all along.

104.    On June 21, 2018 Defendant extended Plaintiff's administrative leave for another 30 days.

105.    On June 21, 2018, Dr. Garcia called Plaintiff to inform her that her administrative leave was extended for another 30 days. During this call Plaintiff stated she believed she was treated unfairly by Ms. Bohland. Dr. Garcia responded, "oh geeze" but did not offer to intervene or even inquire as to why Plaintiff believes this to be the case.

106.    Dr. Garcia texted Plaintiff on Monday, July 23, 2018 stating he wanted to meet that afternoon to discuss "options".  Dr. Garcia and Jan Lesher met with Plaintiff that afternoon and Dr. Garcia stated he believed Plaintiff was treated fairly, despite never asking Plaintiff why she believed the process had been unfair. He told her she had 24 hours to decide to submit a letter of resignation or choose to be fired.

107.    Plaintiff refused to resign and was terminated effective July 24, 2018.

108.    When the staff were informed that Plaintiff Whiting no longer worked for the County, Ms. Linda Everett, a staff person who reported to Mark Person  was noted by

multiple people to have a smile on her face with this news, asked Dr. Francisco Garcia if Mark Person was going to be put in Plaintiff's position.

109.   Defendant Person pursued Plaintiff Whiting's job as soon as her termination was announced and Defendant Person's staff spoke openly of a plan to rehire Defendant Clinton once Defendant Person was promoted to Plaintiff's job.

110.   Defendant Person made various defamatory statements about Plaintiff Whiting with regard to Plaintiff being a bully and Plaintiff's actions as a supervisor in an effort to get her fired so he could have her job.

111.   Defendant Clinton also made defamatory statements about Plaintiff Whiting with regard to Plaintiff Whiting being a bully relating to her abilities as a supervisor, to both people inside and outside of the County. Defendant Clinton's also made statements that Plaintiff was a racist.

112.   On two separate occasions, staff in Plaintiff's department reported to Plaintiff complaints of bullying in the workplace including one complaint against Mark Person that was reported to Corry Dent in Human Resources.

113.   However, those complaints were ignored by Human Resources, the staff members making the complaints were not asked to meet with HR, nor was Defendant Person placed on administrative leave, disciplined or terminated.

114.   Additionally, Plaintiff was aware of a number of other non-disabled, similarly situated, management level employees who were accused of bullying behavior but were not terminated by Defendant Pima County.

115.   Plaintiff was made aware that Dr. Garcia intervened in at least one of these complaints to halt the investigation against one of his non-disabled, staff who was accused of multiple issues.

**COUNT ONE**

**VIOLATION OF THE REHABILITATION ACT**

**(AGAINST PIMA COUNTY ONLY)**

116. By reference hereto, Plaintiff hereby incorporates all prior paragraphs as if fully alleged herein.

117. At all times relevant hereto, Defendant Pima County has been subject to the requirements of the Rehabilitation Act, as the County receives and utilizes federal funding.

118. At all times relevant hereto, Plaintiff was an employee with a disability/impairment as defined under the Rehabilitation Act or she was regarded as a person with an impairment as defined by the statute and performed all her responsibilities with an approved accommodation.

119. Prior to May 2018, Plaintiff had been supervised for the prior year by Dr. Garcia and utilized an accommodation where she worked from home two days a week. Following Dr. Garcia finding out about the accommodation, he immediately questioned the accommodation and stated that it would be "revisited" and, in less than 90 days, Plaintiff's employment with Defendant Pima County was terminated.

120. Plaintiff's was discriminated against, retaliated against and terminated due to her disability/impairment accommodation by Defendant Pima County in violation of Section 504 of the Rehabilitation Act.

121. As a direct and proximate result of Defendant Pima County's intentional discrimination, Plaintiff has sustained economic damages in the form of loss of wages and the value of job benefits in an amount to be proven at trial.

122. In addition, Defendant Pima County's actions have caused, continue to cause, and will cause Plaintiff to suffer damages for emotional distress, mental anguish, loss of enjoyment of life, damage to her reputation due to her termination, and other non-pecuniary losses all in an amount to be proven at trial.

## COUNT TWO

## INTERFERENCE WITH CONTRACTUAL RELATIONSHIP

## (AGAINST DEFENDANTS MARK PERSON AND CHERI CLINTON ONLY)

123. By reference hereto, Plaintiff hereby incorporates all prior paragraphs as if fully alleged herein.

124. A valid employment contractual relationship or business expectancy existed between Plaintiff and Pima County.

125. Defendants Mark Person and Cheri Clinton had knowledge of the employment relationship or business expectancy between Plaintiff and Pima County.

126. Defendants Person and Clinton intentionally interfered inducing or causing a breach or termination of the employment contractual relationship or expectancy between Plaintiff and Pima County with regard to their actions regarding Person's and Clinton's false allegations of bullying against Plaintiff, their providing both untrue and modified information to the investigators, as well as their attempts to create a false narrative amongst the department's employees which all led to the termination of Plaintiff Whiting's employment relationship with Pima County.

127. As a direct and proximate result of Defendants Person's and Clinton's intentional interference, Plaintiff has sustained economic damages in the form of loss of wages and the value of job benefits in an amount to be proven at trial.

128. As a direct and proximate result of Defendants Person's and Clinton's intentional interference, Plaintiff has also suffered damages in the form of emotional distress, anxiety, depression, sleeplessness, loss of self-worth, loss of reputation in the community, her career, and employment with the County, and extreme stress which has exacerbated the physical symptoms and the side effects of Plaintiff's serious medical condition.

129. Defendants Person's and Clinton's conduct was willful, malicious and evidence an evil mind and Plaintiff is, therefore, entitled to recover punitive and exemplary damages arising from Defendant Person's and Clinton's tortious conduct.

**COUNT THREE**

**DEFAMATION**

**(AGAINST DEFENDANTS MARK PERSON AND CHERI CLINTON ONLY)**

130. By reference hereto, Plaintiff hereby incorporates all prior paragraphs as if fully alleged herein.

131. Defendants Mark Person and Cheri Clinton made various false statements in support of Defendant Person's internal complaint against Plaintiff relating to Plaintiff being a bully which was defined in great detail by Pima County policy and about her performance as a supervisor including but not limited to Plaintiff's actions relating to the termination of Defendant Cheri Clinton. Additionally, following her termination Clinton made statements to Pima County alleging that Plaintiff was racist. Said false statements were published to individuals inside and outside the County.

132. Defendants Person and Clinton made various false statements against Plaintiff knowing the statements were false and defamatory.

133. These published defamatory statements are false and bring Plaintiff into disrepute, contempt and ridicule and impeach her honesty, integrity, virtue and reputation by stating that she engaged in such misconduct in her trade, profession, office or occupation. Defendants Person's and Clinton's statements are also defamatory because they would deter third persons from dealing or associating with Plaintiff.

134. As a direct and proximate result of Defendants Person's and Clinton's false and defamatory statements Plaintiff has sustained economic damages in the form of loss of wages and the value of job benefits in an amount to be proven at trial.

135. As a direct and proximate result of Defendants Person's and Clinton's defamatory statements, Plaintiff has also suffered damages in the form of emotional distress, anxiety, depression, sleeplessness, loss of self-worth, loss of reputation in the community, her career, and employment with the County, and extreme stress which has exacerbated the physical symptoms and the side effects of Plaintiff's serious medical condition.

136. Defendants Person's and Clinton's conduct was willful, malicious and in reckless disregard to the rights of Plaintiff that evidence an evil mind and Plaintiff is therefore entitled to recover punitive and exemplary damages arising from Defendant Person's conduct.

**COUNT FOUR**

**VIOLATION OF THE ADAA**

**(AGAINST PIMA COUNTY ONLY)**

137. By reference hereto, Plaintiff hereby incorporates all prior paragraphs as if fully alleged herein.

138. At all times relevant hereto, Defendant has been subject to the requirements of the ADAA.

139. At all times relevant hereto, Plaintiff was an individual with a disability as defined under the ADAA inasmuch as she has a disability as defined by the statute or was regarded as a person with an impairment as defined by the Act.

140. Moreover, at all times relevant hereto, Plaintiff has been a qualified individual with a disability as that term is defined by 42 U.S.C. § 12111 (8) and able to perform the essential functions of her job with reasonable accommodations.

141. Prior to May 2018, Plaintiff had been supervised for the prior year by Dr. Garcia without any issue and utilized an accommodation where she worked from home two days a week. Following Dr. Garcia events described herein as well as his claim that he did not know about the accommodation, he immediately questioned the accommodation and

stated that it would be "revisited". In less than 90 days, Plaintiff's employment with Defendant Pima County was terminated.

142. Plaintiff was discriminated against and terminated due to her disability and accommodations.

143. Defendant Pima County's actions amount to a violation of the ADAA 42 U.S.C. § 12112, which prohibits discrimination on the basis of disability.

144. As a direct and proximate result of Defendant Pima County's intentional discrimination, Plaintiff has sustained economic damages in the form of loss of wages and the value of job benefits in an amount to be proven at trial.

145. In addition, Defendant Pima County's actions have caused, continue to cause, and will cause Plaintiff to suffer damages for emotional distress, mental anguish, loss of enjoyment of life, damage to her reputation due to her termination, and other non-pecuniary losses all in an amount to be proven at trial.

**WHEREFORE**, Plaintiff demands judgment against Defendants, jointly and severally, as follows:

1. For General and Special damages to be proven at trial;

2. For compensatory damages relating to emotional distress as proven at trial;

3. For punitive and exemplary damages to be proven at trial (against Person and Clinton only);

4. For reasonable attorneys' fees and costs; and

5. For such other relief, the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a jury trial.

DATED this  4th   day of  October 2019.

**SCHLEIER LAW OFFICES, P.C.**

/s/ Bradley H. Schleier
Bradley H. Schleier
Brad@SchleierLaw.com
3101 North Central Ave., Suite 1090
Phoenix, Arizona 85012
*Attorneys for Plaintiff Danna Whiting*

**MAILING CERTIFICATE**

I certify that on this 4th day of October 2019, I electronically filed the foregoing

**Second Amended Complaint** using Court's CM/ECF system and notification shall be sent

to the following:

Daniel Jurkowitz, SBN 018428
Jennifer Blum, SBN 029716
Deputy County Attorney
**BARBARA LAWALL**
**PIMA COUNTY ATTORNEY**
**CIVIL DIVISION**
32 North Stone Avenue, Suite 2100
Tucson, Arizona 85701
*Attorneys for Defendants Pima County; Pima County*
*Board of Supervisors; Mark Person; and Cheri Clinton*

/s/ Mary H. Portillo

- 24 -